JOURNAL ENTRY AND OPINION
Petitioner-appellant Laura Samples (Samples ; d.o.b. April 29, 1968) appeals from the May 19, 2000 order of the trial court dismissing her petition for a protection order made pursuant to Ohio's civil domestic violence statute, in this case R.C 3113.31(A)(1)(b)[1], and vacating an ex parte temporary protection order which was entered by the trial court upon the filing of Samples' petition. For the reasons adduced below, we affirm.
A review of the record on appeal indicates that Samples, who lives on Fortune Avenue in Parma, Ohio, is the mother of a teenage daughter, Nakita Cruz (Nakita, d.o.b. February 22, 1986). Nakita's father is Kenuel Cruz, Sr. (Cruz or father). Samples and Cruz are divorced. See Cuyahoga County Common Pleas Court, Domestic Relations Division, Case No. 88-D-188350. Nakita's step-mother, respondent-appellee Connie Cruz (step-mother), is married to Kenuel Cruz, Sr., and they live on Storer Avenue in Cleveland,
On Wednesday, April 12, 2000, Samples and the father entered into a shared parenting agreement, a copy of which was attached to the petition, which settled a variety of pending motions before the trial court concerning child custody and visitation. See Journal Vol. 3562, pages 815-817. Pursuant to paragraph 1(a) of this agreement, the father was to have possession of Nakita beginning on Wednesdays at the close of Nakita's school day through her drop off at school on Friday mornings. This agreement, at paragraph 2, gave permission for Samples to take Nakita to the State of Alabama during the Easter school break in 2000 for the purpose of visiting Nakita's half-sister, and authorized Samples to pick Nakita up after school on Thursday, April 20, 2000, for the interstate travel purpose.
On Wednesday, April 19, 2000, Samples dropped Nakita off at school in the morning. When school let out at 2:20 p.m., Nakita walked to her father's house which was approximately one-half mile away from the school, arriving at her father's home at approximately 2:45 p.m. At the home, Nakita found her grandparent and her step-sister, Chrystal. Nakita then telephoned her father to ask if she could go to her friend Angela's house nearby. The father told her that she was not to go to Angela's house, but he did give his permission for Angela to come to his house so the two girls could play. When Angela arrived a short time later, the two girls went upstairs to Nakita's bedroom and danced to music.
The step-mother arrived home between 4:30 to 5:00 p.m. that same day. According to Nakita, the step-mother told her to clean up an offending sticker in the bathroom (which Nakita did), and to then get the clothes she was planning on taking the next day to Alabama. Nakita testified that she did as she was told, retrieving from her bedroom her clothing selections and placing them on the kitchen table. The step-mother then surveyed the clothing and, according to Nakita, made various critical remarks concerning the selected clothing, such as, where she had obtained certain items, whether some items were too short, and whether her father allowed her to wear certain items.[2] Nakita testified that she answered her step-mother in a respectful tone of voice, but her step-mother accused her of getting an attitude with her and that I better stop, or I wasn't going to church.[3] (Tr. 103-104.) Nakita's step-sister, Chrystal, who was in the kitchen at the time, yelled to Nakita, What the hell was wrong with you? (Tr. 132.) Nakita responded, Nothing, which then caused the step-sister to question Nakita, Why are you getting an attitude with her?, which Nakita answered, I didn't get an attitude with her. (Tr. 132-133.) With that, Nakita, with a pop-sickle in her mouth and intending to throw its wrapper in the trash, told her step-mother that she was leaving, so I am not going to get an attitude with you. (Tr. 104.) This response, according to Nakita, caused the step-mother to start yelling, scaring Nakita and causing Nakita to think that the step-mother was going to hit her. Nakita allegedly complained to her father about prior beatings by the step-mother, but the father would not believe the daughter, accusing Nakita of lying. The step-mother testified that she had no trouble with Nakita taking clothing to the mother's house, but she was concerned about the clothing being returned because the step-mother pays good money for Nakita's clothes. (Tr. 78.)
Nakita then testified that she grabbed the clothes from the kitchen and proceeded to walk back upstairs. As Nakita turned away from the kitchen table, the step-mother, without warning, allegedly grabbed Nakita's hair and Nakita began to run which, in turn, caused some of the hair to be pulled from the scalp. (Tr. 134-136.) Nakita then ran toward the stairs. As she reached the stairs, Nakita claimed that the step-mother grabbed the hair again and pushed her head, causing Nakita to fall into the carpeted steps, bruising her elbow. (Tr. 139.) Nakita recovered from the pushing and ran upstairs to her bedroom. Within several minutes, the step-mother came into Nakita's bedroom and told Angela to go home and Nakita to meet the step-mother downstairs to talk. Angela did leave, but not before getting a note from Nakita instructing Angela to call Samples' cellular telephone number on the note and tell her what was happening. When Nakita met the step-mother downstairs, the step-mother allegedly forcefully squeezed Nakita's hand, causing Nakita to ask the step-mother to stop squeezing because it was hurting Nakita. In response, the step-mother allegedly said, Too bad. (Tr. 111.) Nakita then testified that she said something wrong, which caused the step-mother to grab Nakita's face and squeeze her lips together. Nakita stated that it felt like she was getting punched in the face. (Tr. 111.)
Nakita then testified that the step-mother grabbed her by the arms and shook her like a roller coaster, hurting her very bad. (Tr. 112.) Then, the step-mother allegedly seated herself in a chair and the two females argued. Nakita testified as follows:
 A. * * * She [the step-mother] said every time I come home from my mother's house I have an attitude with her.
Q. What was your response?
 A. I said, No. I don't. I said, Your daughters have attitude with you all the time and you don't do anything. All you say is, `I am going to ground you,' and you never do, but me you hit me.
Q. How did Connie respond to that?
 A. She said I didn't hit you. (Tr. 113)[explanation added].
The step-mother then telephoned the father and, according to Nakita, lied about what had occurred, claiming that Nakita had raised her fist to the step-mother. Nakita then picked up the telephone and gave her version of the events to the father, and assured him that she was okay and he told her to go to church. (Tr. 114.) While on the telephone, Nakita took an incoming call from her mother and then went to church, where the mother met her and then the two went to the police station. Nakita claimed that the bald spot on her scalp, caused by the removal of hair, hurt for approximately five days following the incident. Nakita was seen by a county social worker after having returned from the trip to Alabama.
The social worker (Pamela Workman) who interviewed Nakita following the trip to Alabama observed no bruises on the child's arms and no scabbing or evidence of a wound when she inspected the girl's scalp (Tr. 59-60.), although she did observe a two centimeter bald spot on Nakita's scalp. Ms. Workman also testified that the step-mother admitted to grabbing Nakita's arms above the elbows, but denied grabbing Nakita's hair.
The step-mother testified that she did not pull Nakita's hair and that Nakita did not fall into the steps, nor did she strike her or choke her. The step-mother further stated that she never had these types of problems with Nakita before and only grabbed Nakita by the arms in an effort to get the girl seated so that the two could talk about their differences regarding the choice of clothing. The step-mother observed no injuries or marks on Nakita when Nakita returned from church the evening of the incident with a police escort, and Nakita voiced no complaints about any injures.
The father testified that he observed no injuries or marks on Nakita when Nakita returned from church the evening of the incident with a police escort, and Nakita voiced no complaints about any injuries.
Nakita's step-sister, Tawny Morris (the daughter of the step-mother), testified that she was at the family home when Nakita returned from church the evening of the incident with a police escort, and Nakita voiced no complaints about any injuries. Also, the witness stated that she observed no injuries or marks on Nakita.
Nakita's brother, Kenuel Cruz, Jr., testified that he was at the family home after Nakita returned from church the evening of the incident with a police escort, and Nakita voiced no complaints about any injuries. Also, the witness stated that he observed no injuries or marks on Nakita, but that Nakita was just crying and said that she and the step-mother had an argument and she was now going home to Samples' house. (Tr. 93-94.)
On May 19, 2000, the trial court denied the relief sought by Samples, stating in pertinent part:
 * * *. Ct. finds respondent acted reasonably in disciplining minor step-child without intent to inflict serious injury. * * *.
Journal Vol. 3582, page 994.
The appellant presents two assignments of error for review. The first assignment of error provides:
 I THE TRIAL COURT ERRED AS A MATTER OF LAW TO THE PREJUDICE OF PETITIONER-APPELLANT, BY HOLDING INTENT TO CAUSE INJURY WAS AN ESSENTIAL ELEMENT OF CIVIL DOMESTIC VIOLENCE, DESPITE OVERWHELMING EVIDENCE OF PHYSICAL INJURY.
In arguing this assignment, appellant initially posits that the trial court utilized Civ.R. 41(B)(2) in involuntarily dismissing the action subsequent to the hearing. Appellant mischaracterizes the procedural history of the case. The record reflects that the plaintiff moved for a directed verdict of dismissal at the close of plaintiff's case. (Tr. 75.) This motion was denied and the defense proceeded to offer its evidence (Tr. 76.), which preceded a finding on the merits of the action. Accordingly, reliance on Civ.R. 41(B)(2), which addresses the involuntary dismissal of an action at the close of a plaintiff's case-in-chief pursuant to a motion to dismiss by the defense, is utterly misplaced and irrelevant to our review.
Appellant next argues that the weight of the evidence does not support the denial of the petition for a civil protection order. In addressing this argument appellant correctly cites to the standard of review contained in Felton v. Felton (1997), 79 Ohio St.3d 34, paragraph two of the syllabus, which states:
 2. When granting a protection order, the trial court must find that petitioner has shown by a preponderance of the evidence that petitioner or petitioner's family or household members are in danger of domestic violence.
R.C. 3113.31(D).
See, also, Thompson v. Koontz (Nov. 22, 2000), Cuyahoga App. No. 77251, unreported, 2000 Ohio App. LEXIS 5474, at 13-14.
In reviewing this manifest weight of the evidence standard, we recognize the following:
 In reviewing a manifest weight of the evidence argument, we note that a judgment supported by some competent, credible evidence going to the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence. C.E. Morris Co. v. Foley Constr. Co. (1978), 54 Ohio St.2d 279, 376 N.E.2d 578. Since the trial judge is best able to view the witnesses and observe their demeanor when he weighs the credibility of the offered testimony, there is a presumption that the findings of the trier of fact are correct. Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 80, 461 N.E.2d 1273. The weight to be given the evidence and the credibility of the witnesses are primarily for the finder of fact. Shore, Shirley Co. v. Kelley (1988), 40 Ohio App.3d 10, 531 N.E.2d 333.
J. Norman Stark Co., L.P.A. v. Dahl (Oct. 19, 2000), Cuyahoga App. No. 77857, unreported, 2000 Ohio App. LEXIS 4895, at 9-10.
As noted by appellant, whether the respondent intended to commit serious physical injury upon Nakita is irrelevant. Instead, the standard as applied to the facts of this case is whether, by a preponderance of the evidence, Nakita was in danger of domestic violence, Felton v. Felton, supra, which, in terms of the relevant portion of R.C.3113.31(A)(1)(b) defining domestic violence, is whether Nakita was placed by the threat of force in fear of imminent serious physical harm.
Based on the evidence offered by the parties, we cannot conclude that the preponderance of the evidence demonstrates that Nakita was placed in fear of imminent serious physical harm, in other words, that the step-mother's conduct constituted domestic violence. If indeed there were bruises on Nakita's arms, these bruises were not evident when she was interviewed by the social worker on April 24, 2000 (five days following the incident). This lack of observable bruising within days following the incident belies the notion that Nakita was in imminent serious physical harm. Also, the bare spot on Nakita's scalp, without evidence of scabbing or recent injury to the scalp, renders a similar conclusion; in fact, the non-presence of scabbing or recent injury to the scalp corroborates the step-mother's testimony that she did not pull on Nakita's hair at all and infers that the bald spot was caused by someone, or something, other than the step-mother. Further, that Nakita was actually in fear of imminent serious physical injury that day is lessened by her not invoking the aid of her grandparent (who was in another room of the house watching television at the time of the incident), telling her father on the telephone within minutes of having received her punishment that she was okay, not showing the injuries later that evening to her father, brother, and step-sister, and not seeking medical attention for the claimed injuries.
The first assignment of error is overruled.
The second assignment of error provides:
 II THE TRIAL COURT ERRED AS A MATTER OF LAW TO THE PREJUDICE OF PETITIONER-APPELLANT, BY HOLDING RESPONDENT ACTED REASONABLY IN DISCIPLINING MINOR STEP-CHILD, DESPITE OVERWHELMING EVIDENCE OF DOMESTIC VIOLENCE.
 In this assignment appellant argues that the manifest weight of the evidence does not support the reasonable parental discipline defense which was found to be present in this case and which absolved the respondent/step-mother of the charge of domestic violence. Appellant argues that the corporal punishment was excessive, when viewed by the weight of the evidence, and resulted in serious physical injury to Nakita, obviating the finding of reasonable parental discipline.
This defense is based on the allowance of reasonable corporal punishment by a parent in disciplining an unruly child, which countervails a charge of domestic violence made pursuant to R.C. 3113.31(A)(1)(a)-(c). See Thompson v. Koontz (Nov. 22, 2000), Cuyahoga App. No. 77251, unreported, 2000 Ohio App. LEXIS 5474, at 15-16, citing State v. Suchomski (1991), 58 Ohio St.3d 74, State v. Hart (1996),110 Ohio App.3d 250, and State v. Hicks (1993), 88 Ohio App.3d 515. In Thompson, the boy victim displayed bruising, welts and other marks to his leg and buttocks, injuries received by the custodial parent's application of whipping the child with a leather belt, five or six times, because the child lied about failing to properly bathe himself. This court affirmed the applicability of the defense by the Thompson trial court because the preponderance of the evidence did not demonstrate domestic violence since the child was not in imminent danger of serious physical harm. In the action sub judice, we have concluded that the weight of the evidence failed to support the notion that the corporal punishment employed by the step-mother placed Nakita in fear of imminent serious physical harm. The harm exhibited by Nakita, which consists of bruising to Nakita's arms (which bruising was not evident five days after the event when Nakita was interviewed by the social worker) and a bald spot on her scalp (which showed no sign of scabbing or recent trauma to the scalp when Nakita was interviewed by the social worker five days after the event, and which bald spot could therefore be found to have not been caused by the step-mother due the lack of recent trauma) do not demonstrate imminent serious physical harm to the child. Further, Nakita's punishment was the result of the step-mother taking exception with Nakita's display of a hostile or disrespectful attitude toward the step-mother. The punishment employed by the step-mother (attempting to hold the child by the arms in an effort to get Nakita to sit down and discuss their differences and, if it did happen, grabbing the child's hair in a similar effort as the child was running away), which are certainly less extreme examples of corporal punishment than the punishment inflicted in the Thompson case, does not appear to be unreasonable or unduly harsh under the circumstances.
The second assignment of error is overruled.
It is ordered that appellee recover of appellant her costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
 ________________________ SWEENEY, JAMES D., P.J.:
JAMES J. SWEENEY, J., and TERRENCE O'DONNELL, J., CONCUR.
[1] R.C. 3113.31(A)(1) provides in pertinent part the following:
(A) As used in this section:
 (1) Domestic violence means the occurrence of one or more of the following acts against a family or household member:
 (a) Attempting to cause or recklessly causing bodily injury;
 (b) Placing another person by the threat of force in fear of imminent serious physical harm or committing a violation of section 2903.211
[2903.21.1] or 2911.211 [2911.21.1] of the Revised Code;
 (c) Committing any act with respect to a child that would result in the child being an abused child, as defined in section 2151.031
[2151.03.1] of the Revised Code.
Ohio. Nikita has lived with her step-mother and father since approximately ten years prior to the event in question.
[2] Nakita testified on cross-examination that Samples had purchased the clothing for her. (Tr. 131.)
[3] Nakita regularly attended church on Wednesday evenings.